[L. A. No. 23836.  In Bank.  Dec. 30, 1955.]

RAYMOND V. RUDOLPH, Respondent, v. ALLEN
TUBBS et al., Appellants.

Crowe, Mitchell & Hurlbutt and J. Thomas Crowe for
Appellants.

Walch & Griswold and Roger R. Walch for Respondent.

GIBSON, C. J.—This action was brought to recover damages for the destruction by fire of stock, fixtures and personal property contained in a building, the larger portion of which plaintiff occupied as lessee for store and residence purposes. Defendant Ehrhorn was the lessee of a gasoline filling station located on the premises and adjacent to the main building.

Defendant Langford operated the service station under a sublease from Ehrhorn, and defendant Tubbs was an employee of Ehrhorn. After trial before a jury, a general verdict for damages was returned against Ehrhorn and Tubbs but not against Langford. Ehrhorn and Tubbs moved for a new trial, and, after denial of this motion, they appealed from the judgment, contending that the evidence was insufficient to support it.

In determining whether the evidence is sufficient we must, of course, view it in the light most favorable to plaintiff. The filling station, insofar as pertinent here, consisted of several gasoline pumps immediately to the south of the building occupied by plaintiff, an office located in the southwest corner of the building, and a lean-to, called the "oil room," attached to the west wall of the building. The wall between the oil room and the building was wooden, with cracks between the boards, and the other walls of the room were of corrugated iron. The floor of this room was either dirt or macadam, and there is evidence that it was not clean. An automatically operated air compressor, driven by an electric motor and used in connection with the filling station, was located just outside the north wall of the room. Access to the oil room was through a doorway about 6 to 8 feet across located at the front, i. e., the south end of the room. At the northeast corner of the room, within a few inches of the wooden wall, was a 50-gallon drum lying horizontally on a frame rack. The drum was in this position when Langford took possession of the station from Ehrhorn about three months before the fire.

On the morning of the fire defendant Tubbs, acting in the course of his employment by Ehrhorn, delivered white gasoline (a gasoline which does not contain tetraethyl lead) to the station in a truck, which he parked about 3 or 4 feet from the oil room. The truck was equipped with a hose for the purpose of delivering gasoline. Tubbs detached the nozzle end of the hose from the truck and, while holding the nozzle and unreeling the hose, walked a distance of about 25 feet to the rear portion of the oil room, where he unscrewed the cap of a "bunghole" at the top side of the drum and poured 40 gallons of white gasoline through the opening. He testified that he then replaced the cap but screwed it on only "a thread or so" and walked back to the truck with the nozzle in his hand, put the nozzle in its keeper and reeled in the hose; that it took not over a minute and a half to pour in the

gasoline, and about two or three minutes more to put on the cap and reel in the hose; and that no one else was in the room with him.

As Tubbs was fastening the hose reel with a chain, Langford came out of the filling station office. After taking a step or two toward the front of the oil room but before reaching the doorway, Langford saw a fire in the oil room about 21 feet from where he was standing. His son and Tubbs, who were both near the truck, also saw the fire, which was at the rear of the room, about 3 feet to the left, or west, of the oil drum. It was burning from the ground and was about 3 or 4 feet in width and height. There was no explosion or other loud noise. Tubbs was asked by Langford if he had a fire extinguisher, but he did not have one although the truck ordinarily carried an extinguisher.

Plaintiff was promptly notified, and when he came to the front of the oil room he saw fire around the drum reaching to the ceiling. He ran to the telephone and called the fire department. Subsequently, while trying to throw water on the fire from the inside of the building, he observed that no fire had come through the rear wall of the oil room or into the portion of the building next to the oil room, but he could see fire through the cracks in the wall. About 10 minutes after plaintiff called the fire department, he saw Tubbs standing 10 to 15 feet from the oil room doorway smoking a cigar which was about half gone. After the fire, the cap from the ''bunghole'' on the drum was not in place, and Langford looked for it but could not find it.

An expert witness testified substantially as follows: White gasoline is not subject to spontaneous combustion. A flame or spark or temperature in excess of 150 degrees Fahrenheit will ignite it, but vapors in a full or nearly full tank will not explode or burn because the mixture is too rich and there is not sufficient oxygen to support combustion. The most dangerous time is when a tank is being loaded, because the vapors within the tank are displaced by the liquid and, being heavier than air, gradually settle to the ground and spread in every direction, at the same time commingling with air. The vapors from the liquid are at first 100 per cent hydrocarbon, but they commingle with the air so that at the edge of the mixture there is always some point where there will be the right combination for ignition. Under these circumstances the possibility of ignition by a spark or flame is so

great that a person should never smoke or strike a match in the vicinity. Depending upon the conditions, including the amount of breeze, the temperature and the type of building, the dangerous period is about 15 minutes. The vapors ignite and burn instantaneously, but in a place such as the oil room, with the door open, there would not be much noise,— not even a muffled explosion. Upon igniting, the vapors could kindle a small accumulation of heavier material, for example, discarded paper matches. If the person who had been filling the tank walked away from it about 10 feet and caused a spark or flame low on the ground, as by a match tossed aside without being properly extinguished, there could very well be a flash fire low on the ground which might not catch his clothes on fire. If the person who filled the tank returned to his truck 25 feet away, rolled up the hose and put it back on the truck, and subsequently there was a fire, it is possible that the fire could have been caused by something done by that person while he was filling the tank.

The evidence supports the findings of the jury, in response to special interrogatories, that Ehrhorn's employee, Tubbs, was negligent and that his negligence was the proximate cause of the fire. It could reasonably be inferred from the evidence, including the testimony of the expert witness, that Tubbs was smoking a cigar when he was in the oil room and that the fire was caused as a result of his having a lighted cigar in the room. Further, it could be inferred that Tubbs did not replace the cap on the drum after he had finished filling it, thus permitting vapors to escape after the drum was filled and permitting the contents of the drum to ignite from the fire which started near the drum. The jury could also find that Tubbs was negligent in not having on the truck the fire extinguisher which was ordinarily carried there and that his failure in this respect contributed to the spreading of the fire. No instructions were requested or given on the subject of res ipsa loquitur, and, in view of our conclusion, it is unnecessary for us to consider whether the doctrine is applicable here.

The judgment is affirmed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.